USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/16/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re OCA Interpreters Litigation

:

 

:

 

:

:

:

-------------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
PAUL A. CROTTY**

10 Civ. 7356 (PAC) (FM)
(10 Civ. 7390)
(10 Civ. 7405)
(10 Civ. 7406)
(10 Civ. 7659)
(10 Civ. 8575)

**FRANK MAAS**, United States Magistrate Judge.

      Plaintiffs Dhiri Trivedi ("Trivedi"), Hrishikesh Bhattacharjee

("Bhattacharjee"), Douga Ba ("Ba"), Pa B. F. Drammeh ("Drammeh"), Hamadou T. Seck

("Seck"), and Mamadou Hafiz Jallow ("Jallow") (collectively, "Plaintiffs"), are court

interpreters.  They bring this consolidated action against their former employer, the New

York Unified Court System ("UCS") Office of Court Administration ("OCA"),[1] pursuant

to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII").

The Plaintiffs allege that OCA wrongfully terminated them from their positions as court

interpreters after they failed either an English Proficiency Exam ("EPE") or an oral

assessment exam in their interpreting languages.

---

    [1]     OCA serves as the administrative office for UCS.  (See ECF No. 50 (Aff. of OCA
Ass't Deputy Counsel Pedro Morales, sworn to on Jan. 31, 2013 ("Morales Aff.")), ¶ 2) (citing
N.Y. Judiciary Law § 212(1)(b)).

They further claim that OCA developed and administered those exams in a discriminatory manner on the basis of their race, color, and national origin.[2]

OCA has now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons set forth below, that motion should be granted in its entirety, and the Plaintiffs' Title VII claims should be dismissed.

I.    Background

The facts, construed in the light most favorable to the Plaintiffs, are as follows:

A.    OCA

In the state courts, interpreters are responsible for "interpreting between English and another language in courtroom and other settings; translating official, technical, medical and legal documents, . . . and other . . . material . . . into the English language; and assisting non-English speaking persons in filling out forms and preparing complaints." (Morales Aff. ¶ 7 & Ex. A).

OCA oversees all aspects of the employment of court interpreters, including "the development and implementation of selection procedures to ensure that court interpreters have the necessary language proficiency to perform their duties competently and professionally."  (N.Y.S. Unified Court System, UCS Court Interpreter Manual and Code of Ethics 3 (Dec. 2008), available at http://www.nycourts.gov/courtinterpreter/pdfs/ CourtInterpreterManual.pdf (last visited July 9, 2013)).

---

[2]    The Plaintiffs' other claims were previously dismissed.

B.    Plaintiffs' Background and Employment with OCA

Trivedi was born in India in 1934, and lived there until 1976, when she moved to the United States.  (Morales Aff. Ex. AT ("Trivedi Dep.") at 5-6; ECF No. __ (Decl. of Gregory Antollino, dated Mar. 27, 2013 ("Antollino Decl.")), Ex. 3 ("Trivedi Aff.") ¶ 6).  Throughout grade school, college, and law school, Trivedi spoke and received instruction in English, which is one of the official languages of India.  (Trivedi Aff. ¶ 6).  She started working in the New York State court system as a freelance interpreter around 1980.  (Trivedi Dep. at 6).  On June 16, 2005, Trivedi was appointed by OCA as a court interpreter; her official title was "Court Interpreter, Hindi (Part-Time)."  (Morales Aff. Ex. B; Trivedi Aff. ¶ 5).  She was not required to take any proficiency exam prior to being appointed as a part-time interpreter.  (Trivedi Dep. at 11).  Although she was appointed to interpret Hindi, Trivedi also is fluent in Urdu and Gujarati and interpreted those languages as well.  (Trivedi Aff. ¶¶ 3, 5).

Bhattacharjee is a Bengali man, born in Bangladesh in 1947, who moved to the United States in 1979.  (Morales Aff. Ex. AV ("Bhattacharjee Dep.") at 4-5, 21-22).  He speaks fluent English and Bengali.  (Antollino Decl. Ex. 6 ("Bhattacharjee Aff.") ¶ 3).  When Bhattacharjee began working for UCS as an on-call interpreter in 1996, he was not required to take any form of language proficiency exam because such an exam did not exist at that time.  (Bhattacharjee Dep. at 8).  In 2006, after he passed the EPE, UCS hired him as a full-time employee to interpret Bengali.  He also interpreted Hindi and Urdu.  (Bhattacharjee Dep. at 6-8; Bhattacharjee Aff. ¶ 4).  His official title was "Court Interpreter, Bengali (Full Time)."  (Morales Aff. Ex. G).

Ba is an African-American man born in Senegal in 1954.  He emigrated to the United States in 1983 and began to work for OCA as a per diem French, Wolof, Mandingo, and Bambara court interpreter in 1992.[3]  (Morales Aff. Ex. AX ("Ba Dep.") at 11, 34, 72-73; Antollino Decl. Ex. 5 (Undated Aff. of Douga Ba ("Ba Aff.")) ¶ 3).  Although he interpreted several languages, he was not tested in Wolof or Mandingo when he began his work because there were no exams for those languages at that time.  (Ba Dep. at 13).  In April 2001, UCS hired Ba as a full-time interpreter of French and Wolof, although he also continued to interpret Mandingo and Bambara.  (Ba Dep. at 11, 17; Ba Aff. ¶ 4).  His official title was "Court Interpreter - French."  (Morales Aff. Ex. N).  Prior to beginning his full-time position, Ba never took a language proficiency exam administered by UCS.  (Ba Dep. at 22-23).

Drammeh is a 57-year-old African-American man who was born and raised, and attended college in Gambia, where English is an official language.  (Morales Aff. Ex. AZ ("Drammeh Dep.") at 27, 32, 44; Antollino Decl. Ex. 2 ("Drammeh Aff.") ¶ 3).  Indeed, English is Drammeh's native language.  (Drammeh Aff. ¶ 3).  Drammeh emigrated to the United States in 1982.  (Drammeh Dep. at 33).  In 1986, he began working for UCS as a per diem interpreter in Criminal Court, where he interpreted Wolof, Mandingo, Fulani, and Soninke.  (Id. at 6; Drammeh Aff. ¶ 4).  When Drammeh was hired as a per diem interpreter, he was given an English and Wolof screening test and asked to complete an application.  (Drammeh Dep. at 9, 11).  In 2001, UCS hired Drammeh to interpret Wolof, Mandingo, Soninke, and Fulani.  (Id. at 14).  Although his

---

[3]      Ba contends that prior to being hired as a per diem interpreter, he took some sort of exam to test his English and French.  (Ba Dep. at 7-10).

official title was "Court Interpreter - French," (Morales Aff. Ex. T), Drammeh does not

consider himself a French speaker.  (Drammeh Dep. at 21; Drammeh Aff. ¶¶ 4-5).

Instead, Drammeh interprets Wolof, Fulani, Mandingo, and Soninke.  (Drammeh Dep. at

23).  From 1986 through the time he was hired as a full-time interpreter in 2001,

Drammeh never took an exam to assess his proficiency in those languages.  (Id. at 17-18).

Seck is a Black African male from Senegal with a diploma from the

University of Dakar.  (Morales Aff. Ex. BA ("Seck Dep.") at 25, 38-39, 79).  In 1986,

Seck began working for UCS as a per diem interpreter of French and Wolof; he was

appointed as a permanent staff interpreter of the same languages in 2001.  (Id. at 5-6, 11;

Antollino Decl. Ex. 4 ("Seck Aff.") ¶ 3).  His official title was "Court Interpreter -

French."  (Morales Aff. Ex. Y).  In 1986, when Seck first was hired, he filled out an

application and took a test that consisted of listening to a tape in English and translating it

into French; he is not sure whether that test was administered by OCA.  (Seck Dep. at 16-

19).  Between 1986 and 2001, when he became a full-time employee, Seck never took

any other OCA-administered language proficiency exam.  (Id. at 25-27).

Jallow is a Black African male born in Gambia in 1962.  He emigrated to

the United States in 1991.  (Antollino Decl. Ex. 1 ("Jallow Aff.") ¶ 3; Morales Aff. Ex.

BC ("Jallow Dep.") at 29, 52, 54).  Beginning as early as 1993, Jallow provided freelance

interpreting services for the court system.  (Id. at 7-9).  In February 2003, OCA hired

Jallow as a staff interpreter.  Although Jallow's official title was "Court Interpreter -

French," he also interpreted Wolof and Fulani.  (Jallow Dep. at 6, 17).  OCA did not test

his language proficiency in any of these languages prior to appointing him as a staff interpreter.  (Id. at 16-17).

In 2001, the six Plaintiffs, together with thirteen other non-Spanish speaking per diem interpreters, brought a proceeding before the New York State Public Employment Relations Board ("PERB"), in which they alleged that OCA's refusal to elevate them from per diem to permanent employment constituted unlawful discrimination.  (Morales Aff. ¶ 9).  To settle those claims, UCS appointed the Plaintiffs as staff interpreters.  (Id.).

C.    Development of OCA's Language Assessment Exams

Over the past several decades, UCS has been developing a language assessment examination program to determine the competency of court interpreter candidates.  (ECF No. 49 (Aff. of Warren Klein, sworn to on Jan. 30, 2013 ("Klein Aff.")), ¶ 17).  The program consists of two components:  a competitive examination for Spanish staff positions and a noncompetitive examination for non-Spanish staff positions and per diem assignments.  (Klein Aff. ¶ 6).

The Spanish interpreter competency examination is a competitive test which has both written and oral components.  UCS has administered this two-part proficiency test to applicants for Spanish staff interpreter positions approximately every four years since 1980.  (Id. ¶ 7).  To be offered a position as a full-time staff interpreter, a Spanish language interpreter candidate must pass both components of the exam.  (Id.).  With one exception – a change to the format of the examination in 1994 – UCS's

procedure for testing the competency of its staff Spanish language interpreters has not changed since 1980.  (Id. ¶ 17 & n.15).

UCS's procedure for testing the competency of non-Spanish language interpreters, on the other hand, has undergone significant changes over the past twenty-five years.  Prior to 1989, all court interpretation and translation services in languages other than Spanish were performed by per diem interpreters, whose language proficiency was determined by the judge presiding over the case for which the services were required.  (Id. ¶ 17).  To make this assessment, the judge would ask questions about the candidate's knowledge of English and the interpreting language, as well as the candidate's credentials, references, and experience.  (Id.).

Beginning in 1989, UCS developed formal noncompetitive oral proficiency examinations in several interpreting languages, including Greek (1989), Haitian Creole (1991), Polish and Russian (1992), Arabic, Cantonese, Italian, and Korean (1994), and Vietnamese (2001).  (Id. ¶ 17 & n.16).  Once UCS created an oral exam for a particular language, applicants seeking interpreter positions for that language no longer were subject to the informal assessment procedure, but, rather, were required to pass the oral exam.  (See id.).  Applicants seeking staff interpreter positions for languages for which an oral proficiency exam had yet to be developed (including French, Hindi, Punjabi, Urdu, and Wolof) remained subject only to the informal assessment procedure.  (See id. ¶¶ 17-18; ECF No. 66 (Reply Aff. of Mr. Morales, sworn to on Apr. 17, 2013 ("Morales Reply Aff.")), Ex. A ("Klein Dep.") at 18).

In 2000, UCS adopted a written EPE to complement the existing non-Spanish language oral proficiency exams.  (Klein Aff. ¶ 18).  From that point forward, UCS's protocols for the screening of non-Spanish language interpreters, and the rationales therefor, became somewhat complicated.  Essentially, the interpreters fell into one of three groups.  The first group consists of applicants to interpret languages for which oral tests had been developed.  These applicants were required to pass the EPE before they could take an oral exam in a foreign language.  (See Klein Dep. at 16, 68-71).

Second, individuals who had been hired prior to 2000 to interpret languages for which oral exams already existed (including Greek, Haitian Creole, Polish, Russian, Arabic, Cantonese, Mandarin Chinese, Italian, and Korean) were not required to take the EPE.  The stated rationale for this policy is that, prior to the adoption of the EPE in 2000, the oral examinations were considered sufficient to establish an interpreter's competency in English.  (See id. at 70-72; Morales Reply Aff. Ex. B (Aff. of Warren Klein, sworn to on Feb. 15, 2013 ("Klein Suppl. Aff.")), ¶ 4(c)).[4]

Finally, interpreters of languages for which formal oral examinations had yet to be developed also were not required to take the EPE; instead, they continued to be hired pursuant to the informal assessment procedure.  (See Klein Dep. at 68-71, 73-74).

In 2006, in response to concerns that interpreters subject only to the informal assessment procedure were not performing adequately, UCS extended the requirement that interpreters pass the written EPE to interpreters of all non-Spanish

---

[4]    Because passing an oral test was considered sufficient to demonstrate an interpreter's proficiency in English prior to the adoption of the EPE, any interpreter who passed such an exam before 2000 also was not required to take the EPE to become qualified to interpret a secondary language.  (See Klein Dep. at 72-74; Antollino Decl. Ex. 9).

languages, including those for which a formal oral exam had yet to be developed.  (See Klein Suppl. Aff. ¶ 18; Klein Dep. at 12, 68-69).  This requirement, however, was not imposed on interpreters who previously had passed a formal oral assessment exam prior to the adoption of the EPE in 2000, or the post-2000 EPE and oral assessment exam combination.  (See id.).

Thus, since 2006, all staff interpreter applicants for all languages other than Spanish, including the Plaintiffs' interpreting languages, such as French, Hindi, Punjabi, Urdu, and Wolof, were required to pass the written EPE, even though an oral examination had yet to be developed.  (Klein Aff. ¶ 20; Klein Dep. at 17, 70-72).  These applicants were, however, subject to a "credential review process centrally administered by OCA." (Klein Aff. ¶ 17).

Once UCS developed an oral proficiency exam for a particular language, any interpreters of that language were required to pass the new test.  (Klein Aff. ¶¶ 6-7). UCS adopted oral proficiency exams for the Albanian, Bengali, and French languages in 2006, and for the Bosnian, Croatian, Serbian, Hebrew, Hindi, Japanese, Punjabi, Urdu, and Wolof languages in 2008.  (Id. ¶ 20; Klein Dep. at 17, 70-72).

Because the UCS proficiency exams were developed over a protracted period, interpreters hired at different times were subject to different testing procedures. Additionally, the proficiency examinations for different languages have varying formats, depending on the demand for interpreters of those languages.  The written component of the competitive Spanish language proficiency exam, for example, is lengthier than the written component of the non-Spanish language exams (such as the Bengali exam).  (See

Klein Aff. ¶¶ 7, 8, 11, 12).  Moreover, certain languages (including Hindi, Punjabi, Urdu, and Wolof) are not "heavily utilized" by the New York State court system.  Accordingly, because of the "costs associated with developing the longer examination" and the "relatively small pool of candidates for [these] languages," UCS adopted an "abbreviated version" of the oral assessment exam for these languages.  (Id. ¶ 13).

> D.    Events Prior to the Plaintiffs' Termination

In early 2008, OCA notified Trivedi, Ba, Drammeh, Seck, and Jallow that they would be required to pass both the newly-developed EPE and an oral assessment exam as a condition of their continued employment.  (See Morales Aff. ¶¶ 16, 31, 39, 44, 51 & Exs. C, O, U, Z, AE).  By that time, Bhattacharjee already had passed the EPE. (Morales Aff. ¶ 25).  Trivedi, Ba, Seck, and Jallow all passed the EPE later in 2008.  (Id. ¶¶ 18, 33, 45, 52).  During 2008 or early 2009, however, each of these plaintiffs and Bhattacharjee took the oral assessment examinations in their respective languages twice and failed both times.

Drammeh took and failed the EPE twice during 2008.  (Id. ¶¶ 40-41 & Exs. V, W).  Because he did not achieve a passing grade, he was deemed ineligible to sit for the oral exam in his interpreting language.  (See Klein Dep. at 16, 71).

> E.    Termination and Release

On January 30, 2009, Bhattacharjee was notified that he was being terminated because he failed to achieve a passing score on the Bengali oral exam. (Morales Aff. ¶ 29, Ex. L).  On or about the same day, UCS commenced proceedings against Ba and Drammeh under their union's collective bargaining agreement to

terminate them for incompetency based on their failure to obtain passing scores on required examinations.[5]  (Morales Aff. ¶¶ 37, 42, Exs. S, X).  UCS also commenced a proceeding to terminate Seck for incompetency in French on March 25, 2009.  (Morales Aff. ¶ 49 & Ex. AC).

In response to the disciplinary proceedings against Ba, Drammeh, and Seck, the Plaintiffs' union ("Union") filed a complaint with PERB, challenging UCS's right to administer the exams without first negotiating with the Union.  (Id. ¶ 56).  On or about August 13, 2009, OCA, the Union, and the Plaintiffs entered into a Stipulation of Settlement which resolved both the UCS disciplinary proceedings and the PERB proceedings.  (Id. ¶ 56 & Ex. AH ("Release Agreement")).  Each of the Plaintiffs signed the Release Agreement.  (Release Agreement at 6).

Pursuant to the terms of the Release Agreement, OCA afforded each of the Plaintiffs one additional opportunity to pass the examinations they had failed.  (Id. ¶ 4).  The Release Agreement provided, however, that any Plaintiff who did not obtain a passing score would be terminated immediately without a hearing.  (Id.).  In addition, the Release Agreement provided that the "[t]esting results shall be deemed conclusive, and all parties shall be foreclosed from bringing future grievances, arbitrations or actions in law or equity challenging same."  (Id. ¶ 3).  Paragraph 11 of the Release Agreement stated that, "[b]y signing this Stipulation, each of the [Plaintiffs] represents the Union consulted with him/her and explicitly and thoroughly explained the terms of this Stipulation."  (Id. ¶ 11).

---

[5]       Ba was cited for his failure to pass the French oral exam; Drammeh for his failure to pass the EPE.  (Id.).

Thereafter, the Plaintiffs once again failed their exams.  As a consequence, they were either terminated, were not reinstated to their interpreter positions, or were permitted to resign in lieu of termination.

II.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law" based on supporting materials in the record.  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the governing law.'"  Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party.  Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 78 (2d Cir. 2002) (quoting Gummo v. Vill. of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996)).  To defeat a properly supported motion for summary judgment, however, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the party opposing summary judgment must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  Anderson, 477 U.S. at

256; see also FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (non-moving party cannot simply rely on "conclusory allegations or unsubstantiated speculation").

Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court.  Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).  Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried."  Id. at 55.

The Second Circuit has "emphasized that trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue."  Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996).  However, "[e]ven in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than some metaphysical doubt as to the material facts."  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (internal quotations and citations omitted).  Accordingly, a plaintiff cannot rely on inadmissible evidence in opposing a motion for summary judgment.  See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F. 2d 919, 924 (2d Cir. 1985).

III.    Discussion

    A.    Validity of Release Agreement

It is well established that a plaintiff may waive a Title VII claim so long as that waiver is knowing and voluntary.  See Tung v. Texaco, 150 F.3d 206, 207 (2d Cir. 1998);  Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437-38 (2d Cir. 1998);

Mandavia v. Columbia Univ., 912 F. Supp. 2d 119, 129 (S.D.N.Y. 2012) (quoting Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan, 935 F.2d 1360, 1365 (2d Cir. 1991)).  Whether a release meets these requirements is a "peculiarly fact-sensitive inquiry."  Livingston, 141 F.3d at 437-38.  In this Circuit, courts considering the issue "employ a 'totality of the circumstances' test."  Id. at 438.  Among the factors to be considered are

> (1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5) whether the plaintiff was represented by or consulted with an attorney, . . . (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law . . . [and (7)] whether an employer encourages or discourages an employee to consult an attorney and whether the employee had a fair opportunity to do so.

Bormann v. AT&T Commc'ns, 875 F.2d 399, 403 (2d Cir. 1989) (internal quotations and citations omitted).

In its summary judgment motion, OCA first contends that the Plaintiffs' execution of the Release Agreement estops them from challenging their terminations and thereby entitles OCA to summary judgment.  (ECF No. 51 ("OCA Mem.") at 9-11).  The Plaintiffs counter with two arguments.  First, they maintain that the Release Agreement is invalid because the circumstances under which they signed it, as well as its express terms, violate the Older Workers Benefit Protection Act, 29 U.S.C. § 626(f) ("OWBPA").  Second, they assert that the execution of the Release Agreement was not knowing and voluntary.  (ECF No. 61 ("Opp. Mem.") at 14-15).  Neither argument withstands scrutiny.

1.      OWBPA

Congress enacted the OWBPA in 1990 to ensure that "older workers [are] not coerced or manipulated into waiving their rights under the ADEA."  136 Cong. Rec. 27,061 (1990).  Section 7 of the statute permits an employee to waive his ADEA claims, but only if the waiver is knowing and voluntary. 29 U.S.C. § 626(f).  Generally, to meet that standard, the waiver must comply with eight statutory requirements.  Id. § 626(f)(1). Among the requirements dictated by Congress are that the employee "is advised in writing to consult with an attorney prior to executing the agreement" and is given "at least 21 days" to consider whether he should sign.  Id. § 626 (f)(1)(E), (F)(i).  Because of these additional statutory requirements, it is clear that an OWBPA waiver must satisfy a higher standard than that required by the totality of the circumstances test.  Sheridan v. McGraw-Hill Companies, Inc., 129 F. Supp. 2d 633, 639 (S.D.N.Y. 2001).

The Plaintiffs maintain that the OWBPA governs the Plaintiffs' waiver and that the Release Agreement fails to comply with the statute.  Their reliance on the OWBPA is misplaced, however, because that statute applies solely to ADEA claims, not to claims under Title VII or other federal discrimination statutes.  See Tung, 150 F.3d at 208-09 (affirming grant of summary judgment as to Title VII claims under the totality-of-circumstances analysis, but vacating dismissal of ADEA claim because employer failed to comply with OWBPA); Laramee v. Jewish Guild for Blind, 72 F. Supp. 2d 357, 359 (S.D.N.Y. 1999) ("The essential inquiry in determining the validity of a release of a claim brought pursuant to the federal civil rights statutes – other than the [OWBPA] – is whether, considering the 'totality of the circumstances,' the individual's waiver of his or

15

her right can be characterized as 'knowing and voluntary.'") (emphasis added); <u>Rozenfeld v. Dep't of Design & Const. of City of N.Y.</u>, 875 F. Supp. 2d 189, 199 (E.D.N.Y. 2012) ("The statute is unambiguous that the OWBPA applies to ADEA claims only."); <u>see</u> <u>also</u> <u>Branker v. Pfizer, Inc.</u>, 981 F. Supp. 862, 867 (S.D.N.Y. 1997) ("failure to comply with the OWBPA cannot invalidate release of [plaintiff's] claims under [state anti-discrimination laws], since the provisions of the OWBPA apply only to the ADEA and not to state law claims").[6]   Accordingly, the Release Agreement need not comply with the OWBPA to be valid.

## 2.   Totality of the Circumstances Test

The Plaintiffs' alternative argument is that, even if the OWBPA does not apply to the Release Agreement, their waivers cannot be considered knowing and voluntary under the totality of the circumstances test.   Accordingly, I will turn to the factors delineated in <u>Bormann</u>.

### a.   Plaintiffs' Education and Business Experience

The Plaintiffs are well-educated, experienced court interpreters.   Trivedi graduated from Bombay University and Government Law School in India, and has been working as a court interpreter since 1978.   (Morales Aff. Ex. B).   Bhattacharjee, a court

---

[6]   Although the Plaintiffs argue that "the Court must consider Congress' intent" under the OWBPA, (Opp. Mem. at 15), the Court may "not resort to legislative history to cloud a statutory text that is clear."   <u>Ratzlaf v. United States</u>, 510 U.S. 135, 147-48 (1994).   Here, the language of the statute plainly belies any assertion that it applies to non-ADEA claims.   <u>See</u> <u>Chaplin v. NationsCredit Corp.</u>, 307 F.3d 368, 375 (5th Cir. 2002) ("One need only cursorily examine the text of the OWBPA to see that it applies only to ADEA claims.   The OWBPA states that '[a]n individual may not waive any right or claim <u>under</u> <u>this</u> <u>chapter</u> unless the waiver is knowing and voluntary.'   29 U.S.C. § 626(f)(1).   The phrase 'this chapter' . . . refers to chapter 14 of title 29 of the United States Code, <u>i.e.</u>, the ADEA.") (emphasis in original).

interpreter since 1996, graduated from Dacca University in Bangladesh, where she studied economics, among other subjects.  (Id. Ex. G).  Ba received an Associate Degree from Lycee Technique Maurice Delafosse, where he studied French for four years.  (Id. Ex. N).  He has been a court interpreter since 1996 and prior to that time held a position in computer maintenance.  (Id.).  Drammeh, who has been a court interpreter since 1986, studied agricultural science for two years at Prince George College.  (Id. Ex. T).  Seck studied finance for five years, two years at the Borough of Manhattan Community College, where he received an A.A.S. degree, and three additional years at Baruch College.  (Id. Ex. Y).  Finally, Jallow received an Associate Degree in liberal arts from Borough of Manhattan Community College.  (Id. Ex. AD).

The Plaintiffs consequently have significantly more than the minimum level of education and experience that judges in this Court have considered necessary for a waiver to be knowing and voluntary.  See, e.g., Cordoba v. Beau Dietl & Assocs., No. 02 Civ. 4951 (MBM), 2003 WL 22902266, at *5 (S.D.N.Y. Dec. 8, 2003) (employee with "high school diploma, one year of college, an associate business degree in Accounting, employment in . . . accounting department for five years, and employment generally for approximately 25 years" assumed capable of understanding a release); Bachiller v. Turn On Prods., Inc., No. 00 Civ. 8701 (JSM), 2003 WL 1878416, at *4 (S.D.N.Y. Apr. 14, 2003), aff'd, 86 F. App'x 465 (2d Cir. 2004) (plaintiff with high school equivalency diploma who served as accounts payable clerk knowingly and voluntarily released claims); Laramee, 72 F. Supp. 2d at 360 (mere fact that plaintiff was a secretary with only a high school education did not warrant invalidating a waiver of Title VII claims).

17

Moreover, by virtue of their occupation, the Plaintiffs plainly are not strangers to such legal documents as waiver agreements. This factor consequently weighs in favor of the waiver's validity.

<strong>b.      <u>Time to Review the Release Agreement</u></strong>

Four of the Plaintiffs signed the Release Agreement on June 30, 2009, but the Release Agreement does not reflect when the other two signed. (<u>See</u> Release Agreement at 6). It also is unclear when the Plaintiffs first received the Release Agreement. In the absence of any showing that the Plaintiffs had inadequate time to consider the Release Agreement, this factor appears to be neutral.

The Plaintiffs argue, however, that "the time factor was constricted by the pressure of their financial circumstances," thus leaving them with "no choice but to sign." (Opp. Mem. at 17; <u>see</u> <u>also</u> Seck Dep. at 118-19 (stating that Seck asked that the language be changed so that he could press his claim before PERB, but eventually signed the document "under duress")). Despite these conclusory assertions, it is clear that the Plaintiffs have failed to establish that they acted under economic duress.

To state a claim for economic duress, a plaintiff must demonstrate "that the agreement was obtained: [i] by means of wrongful threat precluding the exercise of free will; [ii] under the press of financial circumstances; [iii] where circumstances permitted no other alternative." <u>Mazurkiewicz v. N.Y.C. Health and Hospitals Corp.</u>, 585 F. Supp. 2d 491, 500 (S.D.N.Y. 2008) (quoting <u>Frumkin v. Int'l Bus. Machs. Corp.</u>, 801 F. Supp. 1029, 1044 (S.D.N.Y. 1992) (internal quotations omitted)). Given these elements, a "party seeking to void a release agreement on grounds of economic duress 'shoulders a

18

heavy burden.'"  Davis & Assocs., Inc. v. Health Mgmt. Servs., Inc., 168 F. Supp. 2d

109, 114 (S.D.N.Y. 2001) (quoting Int'l Halliwell Muses v. Cont'l Copper & Steel Indus.,

544 F.2d 105, 108 (2d Cir. 1976)).  Such agreements consequently "may be voided on

grounds of economic duress only in 'extreme and extraordinary cases.'"  Id. (quoting

VKK Corp. v. NFL, 244 F.3d 114, 123 (2d Cir. 2001)).

          Although the Plaintiffs argue that they faced pressure to sign the Release

Agreement because of their financial circumstances, "difficult financial circumstances,"

without more, are insufficient to support a claim of economic duress.  Nasik Breeding &

Research Farm Ltd. v. Merck & Co., Inc., 165 F. Supp. 2d 514, 527 (S.D.N.Y. 2001);

accord, Pallonetti v. Liberty Mut., No. 10 Civ. 4487 (RWS), 2011 WL 519407, at *5

(S.D.N.Y. Feb. 11, 2011) (withholding severance pay held insufficient to state claim for

economic duress); Shain v. Center for Jewish History, Inc., No. 04 Civ. 1762 (NRB),

2006 WL 3549318, at *5 (S.D.N.Y. Dec. 7, 2006) ("the law is clear that the mere

inability to pay one's bills is not enough to demonstrate a lack of a practical alternative to

signing the release").  Furthermore, "difficult choices do not constitute duress."  Joseph v.

Chase Manhattan Bank, 751 F. Supp. 31, 36 (E.D.N.Y. 1990).  Here, the Plaintiffs had

the option of continuing to challenge the examinations through the grievance procedure,

but instead chose to forego their claims in exchange for one more opportunity to pass the

proficiency tests.  These circumstances are insufficient to establish economic duress.

          c.      Plaintiffs' Role in Deciding Release Agreement Terms

          The Plaintiffs contend that they played no role in drafting the Release

Agreement.  (Opp. Mem. at 17).  There is evidence, however, that OCA and the

Plaintiffs' Union representative negotiated at least some terms of the Release Agreement. Specifically, in a letter dated August 3, 2009, which is attached to the Release Agreement, the Union identified certain concessions to which OCA had agreed during the week of July 20, 2009.  Those concessions included:  (i) permitting the Plaintiffs to resign if they failed the assessment exam, (ii) not disclosing the test results of any Plaintiffs who failed the test unless required by law, and (iii) allowing any Plaintiffs who failed the assessment exam an opportunity to review their tests.  (Morales Aff. Ex. AH at 8-9).[7]  The Plaintiffs do not appear to dispute that the Union obtained such significant concessions from OCA on their behalf, nor do they cite any evidence that the Union failed to negotiate effectively on their behalf.  Instead, the Plaintiffs simply assert that "unions do not represent individuals, they represent memberships."  (Opp. Mem. at 17).  Even if that were shown to be true, in this instance the Union obviously went to bat for twelve specific interpreters, not its entire membership, and secured substantial concessions.  This factor therefore weighs in OCA's favor.[8]

---

[7]      It is curious that the Union's letter is dated August 3, 2009, and reflects discussions during the prior week, even though four of the Plaintiffs (Ba, Bhattacharjee, Drammeh, and Jallow) appear to have executed the Release Agreement more than one month earlier.  In their papers, however, the Plaintiffs have not raised this as a reason not to enforce the Release Agreement.

[8]      In any event, even if the Court were to find that OCA offered the Release Agreement to the Plaintiffs on a take-it-or-leave-it basis, this would not be enough to render it unenforceable.  See Pallonetti, 2011 WL 519407, at *7-8 (citing Laramee, 72 F. Supp. 2d at 360); Hsueh v. The Bank of New York, No. 05 Civ. 5345 (JSR), 2006 WL 2778858, at *4-5 (S.D.N.Y. Sept. 26, 2006); Neal v. JPMorgan Chase Bank, N.A., No. 10-1157 (JFB) (ETB), 2012 WL 3249477, at *11 (E.D.N.Y. Aug. 8, 2012).

d.      Clarity of the Release Agreement

OCA contends that the "clear and unequivocal" language of the Release

Agreement provides that, in exchange for an opportunity to take the proficiency

examination one more time, each of the Plaintiffs waived any and all claims relating to

the tests.  (OCA Mem. at 10).  The Plaintiffs, on the other hand, suggest that there are

several aspects of the Release Agreement which render it "not reasonably understood."

(Opp. Mem. at 15).  Their assertions in this regard verge on the absurd.

As an initial matter, the Plaintiffs contend that Paragraph 14 of the Release

Agreement is grammatically unclear.  That paragraph provides:

> This stipulation constitutes the entire settlement of the above-
> captioned matters and the identified disciplinary matters and
> forecloses the Union, or any individual, from bringing future
> grievances, arbitrations or actions in law or equity concerning
> claims related to the aforementioned matters.

(Release Agreement ¶ 14).  The Plaintiffs take issue with the phrase "or any individual,"

arguing that (i) because it is offset by commas, the phrase merely "redefin[es] the Union,"

rather than referring to the Plaintiffs, and (ii) the phrase is overbroad because it can be

interpreted to refer to non-parties who are not bound by the agreement.  (Opp. Mem. at

15).

The first of these contentions is somewhat inconsistent with the Plaintiffs'

argument that unions do not represent individuals.  (Opp. Mem. at 17).  In any event, the

only persons, other than the Union, who might have pursued grievances in other

proceedings were the Plaintiffs and other interpreters who signed the Release Agreement.

It is a basic rule of contract construction that every provision in a contract should be given

meaning.  Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46 (1956).  To read the words

"or any individual" as synonymous with the Union would be inconsistent with this

precept.  Moreover, the fact that it might have been better draftstmanship to refer to "any

of the interpreters identified in the Release Agreement," rather than "any individual"

hardly renders the actual wording ambiguous.  Indeed, earlier in the Release Agreement,

the parties identify the specific "individuals" whom it is intended to benefit.  (Release

Agreement ¶ 4).

   The Plaintiffs also complain that the Release Agreement does not expressly

refer to discrimination claims.  What they fail to note, however, is that several judges in

this District have held that a release need not specifically mention Title VII to be

enforceable.  See, e.g., Tung v. Texaco, Inc., 32 F. Supp. 2d 115, 118 (S.D.N.Y. 1997),

rev'd on other grounds, 150 F.3d 206 (2d Cir. 1998) (granting dismissal of Title VII

claims because plaintiff had released defendant from "all claims . . . in connection with

[plaintiff's] employment or separation from employment"); Baba v. Warren Management

Consultants, Inc., 882 F. Supp. 339, 343-44 & n.4 (S.D.N.Y. 1995) (dismissing plaintiff's

Title VII claim based on "general waiver" that did not explicitly reference Title VII).

   Finally, the Plaintiffs contend that Paragraph 14 of the Release Agreement

allegedly limits the scope of the Plaintiffs' release to charges and grievances previously

filed and, therefore, does "not cover any discriminatory practice that was part of the

testing itself."  (Opp. Mem. at 16).  They base this argument on language in that

paragraph which refers to "settlement of the above-captioned matter and the identified

matters," arguing that the only such matters are the PERB and disciplinary proceedings.

(<u>Id.</u>).  What the Plaintiffs overlook is Paragraphs 3 and 4 of the Release Agreement, which state:

> 3.     As a qualification for employment as a non-competitive court interpreter, the UCS requires that court interpreters obtain a passing score on the English proficiency exam and, after passing the English exam, take and pass the proficiency exam in their designated language . . . . <u>Testing results shall be deemed conclusive, and all parties shall be foreclosed from bringing future grievances, arbitrations or actions in law or equity challenging same.</u>

> 4.     As specified below, the UCS shall provide [the Plaintiffs] with one (1) additional opportunity to take and obtain a passing score on the proficiency exam in their designated language. . . . <u>Any of the above-named individuals who fail to obtain a passing score on the proficiency exam in their designated language shall be terminated immediately and hereby waive any and all rights they may have, including but not limited to . . . the right to file an appeal, grievance or actions in law or equity concerning this matter.</u>

(Release Agreement ¶¶ 3-4) (emphasis added).  Accordingly, pursuant to the last sentence of Paragraph 3, the Plaintiffs cannot file any action challenging the results of the proficiency exams.  Similarly, pursuant to Paragraph 4, the Plaintiffs have waived "any and all rights they may have," including (but clearly not limited to) the right to file a lawsuit "concerning this matter."  Although "this matter" could be read to refer to either the Plaintiffs' termination or their exam results, under either interpretation they have waived their right to challenge the results of the language assessment exams as they seek to do through their current Title VII claims.  <u>See, e.g.</u>, <u>Fay v. Petersen Publishing Co.</u>, No. 88 Civ. 6499 (MBM), 1990 WL 67397, at *3 (S.D.N.Y. May 17, 1990) ("The language at the agreement's conclusion, referring to [plaintiff's] release of 'any known or unknown claims or demands of any kind or nature,' must be read to mean what it says –

any potential future claims related to plaintiff's employment termination.") (emphasis in original).

       In sum, the Release Agreement is clear.  This factor therefore weighs in favor of the Release Agreement's validity.

       e.      Counsel Representation and Consultation with an Attorney

       Paragraph 11 of the Release Agreement states that "each of the [Plaintiffs] represents the Union consulted with him/her and explicitly and thoroughly explained the terms of this Stipulation."  (Release Agreement ¶ 11).  Further, the Union's president signed the Release Agreement.  (Id.).  Although non-lawyer union representation is not a substitute for consultation with counsel, it is an important factor weighing in favor of a waiver's validity.  See Vargas v. Manhattan and Bronx Surface Transit Operating Authority, No. 08 Civ. 9254 (AKH), 2010 WL 1783555, at *6 (S.D.N.Y. Apr. 30, 2010) (waiver binding where plaintiff "was not represented by an attorney, [but] . . . was assisted by a union representative at each stage of the grievance procedure, including when he ultimately signed the waiver."); Rozenfeld, 875 F. Supp. 2d at 200 (enforcing waiver of Title VII claim by plaintiff who did not consult with attorney, but "was represented by his union representative").

       Although the Release Agreement did not expressly advise the Plaintiffs to consult counsel, the totality of the circumstances test does not require the inclusion of such language in an agreement for a waiver to be valid.[9]  See Prunella v. Carlshire

---

[9]      By comparison, under the OWBPA, waiver of an ADEA claim is not considered knowing and voluntary unless "the individual is advised in writing to consult with an attorney prior to executing the agreement."  29 U.S.C. § 626(f)(1)(E).

Tenants, Inc., 94 F. Supp. 2d 512, 516-17 (S.D.N.Y. 2000), abrogated on other grounds by DaSilva v. Kinsho Intern. Corp., 229 F.3d 358 (2d Cir. 2000) (waiver valid despite failure to advise plaintiff to seek advice of counsel); see also LaRue v. New York City Off-Track Betting Corp., No. 03 Civ. 783 (RMB), 2004 WL 2793195, at *7 (S.D.N.Y. Dec. 6, 2004) (dictum that "courts have found a valid waiver even where, as here, the plaintiff did not consult an attorney prior to signing it").  Moreover, there is no evidence that OCA discouraged the Plaintiffs from conferring with counsel, nor is there any suggestion that they did not have sufficient time to do so.  This factor too therefore weighs in favor of OCA.  See Larue, 2004 WL 2793195, at *7 (noting lack of evidence that OTB discouraged plaintiff from consulting with counsel); Rozenfeld, 875 F. Supp. 2d at 200 (finding waiver despite lack of "evidence [d]efendants either encouraged or discouraged [p]laintiff from consulting an attorney").

          f.    Consideration

          Under the terms of the Release Agreement, the Plaintiffs received numerous benefits.  Specifically, OCA agreed to (i) withdraw the pending disciplinary charges against Drammeh, Ba, and Seck; (ii) provide Ba, Jallow, Seck, and Trivedi with one further chance to pass the assessment exam in their designated languages; (iii) afford Drammeh one more opportunity to pass the EPE; and (iv) provide Bhattacharjee with one additional opportunity to pass the Bengali assessment exam.  (Release Agreement ¶¶ 2, 4, 6, 7).  These concessions by OCA plainly constituted sufficient consideration for the Plaintiffs' Title VII waiver under the totality of the circumstances test.  See Vargas, 2010 WL 1783555, at *6 (reduction in punishment constitutes sufficient consideration);

Rozenfeld, 875 F. Supp. 2d at 200 (agreement not to pursue disciplinary action constitutes adequate consideration).

The Plaintiffs contend that, because OCA itself received benefits under the Release Agreement – namely, the Union's withdrawal of its grievances – this factor is neutral. Nevertheless, the question is not whether both sides received a benefit – they clearly did – but whether the Plaintiffs received consideration beyond that to which they were entitled. Bormann, 875 F.2d at 403. Here, OCA was not obligated to drop the pending disciplinary charges. Furthermore, OCA contested the Union's claim that the Plaintiffs could not be terminated for failing to pass their language examinations. By dropping the charges and affording the Plaintiffs another chance to take and pass the tests, OCA gave the Plaintiffs something of value. Accordingly, this factor weighs in favor of the Release Agreement's validity. Cf. Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 401 (S.D.N.Y. 2002) ("[c]ertainly, [defendant's] relinquishment of . . . claims would qualify as valuable consideration and something to which [plaintiff] was not already entitled").

* * *

In sum, all but one of the Bormann factors support the validity of the Plaintiffs' waiver and the only remaining factor – the time that the Plaintiffs had to review the Release Agreement – is neutral. In these circumstances, it is clear that the totality of the circumstances warrants a finding that the Plaintiffs' execution of the Release Agreement was knowing and voluntary. Accordingly, OCA's consolidated

motion for summary judgment should be granted on the basis that the Plaintiffs have waived their Title VII claims.

      B.    <u>Merits of The Plaintiffs' Claims</u>

      Even if the Court were to find no waiver under the Release Agreement, OCA would be entitled to summary judgment with respect to the Plaintiffs' Title VII claims.

      1.    <u>McDonnell Douglas Framework</u>

      Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin."  42 U.S.C. § 2000e-2(a)(1).

      To overcome a motion for summary judgment under Title VII, "a discrimination plaintiff must withstand the three-part burden-shifting laid out by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."  <u>McPherson v. N.Y.C. Dep't of Educ.</u>, 457 F.3d 211, 215 (2d Cir. 2006).[10]

---

      [10]    Language in the Plaintiffs' brief suggests that their claims might more appropriately be presented as allegations of disparate impact, rather than disparate treatment. (<u>See</u> Opp. Mem. at 13 ("whoever . . . implement[ed] a testing regime at OCA might have had good intentions" but "[t]he <u>result</u>, <u>whatever</u> the <u>intention</u>, <u>is</u> <u>disparate</u> and discriminatory"), 24 (noting that the "testing regime produced disparate <u>results</u>") (emphasis added)).  "[D]isparate impact claims are concerned with whether employment policies or practices that are neutral on their face and were not intended to discriminate have nevertheless had a disparate effect on the protected group."  <u>Robinson v. Metro-North Commuter R.R. Co.</u>, 267 F.3d 147, 160 (2d Cir. 2001) (citing <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)).  Accordingly, the <u>McDonnell Douglas</u> test is inapplicable.  <u>See</u> <u>Lowe v. Commack Union Free Sch. Dist.</u>, 886 F.2d 1364, 1373 (2d Cir. 1989).  Nevertheless, both parties have

(continued...)

Under that rubric, the plaintiff must satisfy an initial burden of "proving by the preponderance of the evidence a prima facie case of discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  Accordingly, the plaintiff must show that:  (a) he was within the protected class; (b) he was qualified for the position he held; (c) he was subjected to an adverse employment decision or discharge; and (d) the adverse action occurred under circumstances giving rise to an inference of discrimination. See Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012); Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir. 1997).  "The burden on the plaintiff of presenting a prima facie case under McDonnell Douglas is minimal." Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001) (internal quotation marks omitted).

Once the plaintiff makes out a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." Sharpe v. MCI Commc'ns Servs., Inc., 684 F. Supp. 2d 394, 401 (S.D.N.Y. 2010) (quoting Stratton, 132 F.3d at 879).  This step "force[s] the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." Felder v. Securitcus Sec. Servs., No. 04 Civ. 9501 (LAK), 2006 WL 2627969, at *7 (S.D.N.Y. Sept. 12, 2006) (quoting Fisher v. Vassar Coll., 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc)).

---

[10](...continued)
argued that the McDonnell Douglas burden-shifting test for disparate treatment applies.  I consequently have analyzed the merits of the Plaintiffs' claims under this standard.  Cf. Jenkins v. NTE Aviation Ltd., No. 4:09-CV-117-A, 2010 WL 609365, at *3 (N.D. Tex. Feb. 19, 2010) ("applying the legal framework set out by the parties" to plaintiff's age discrimination claim).

Finally, if the defendant meets its burden of production by providing a nondiscriminatory rationale for its conduct, the rebuttable presumption drops out of the case. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993); James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000). The plaintiff then bears the burden of proving not only that the proffered nondiscriminatory reason is pretextual, but also that the defendant discriminated against the plaintiff. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 93-94 (2d Cir. 2001). In other words, the burden shifts back to the plaintiff to prove that "discrimination was the real reason for the employment action." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

Ultimately, "the bottom line in a Title VII summary judgment motion is, simply, whether plaintiff has presented sufficient evidence from which a reasonable trier of fact could determine that defendants discriminated against her." Goldman v. Admin. for Children's Servs., No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *5 (S.D.N.Y. May 29, 2007); see also Reeves, 530 U.S. at 143 ("Although intermediate evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") (internal quotation marks omitted).

2.   Analysis

a.   Prima Facie Case

There is no dispute that the Plaintiffs have satisfied the first and third elements of a prima facie claim of discrimination. As natives of India, Bangladesh, Senegal, and Gambia, each is a member of a protected class. See, e.g., Shahid v. N.Y.C.

Health and Hospital Corp., No. 03 Civ. 8413 (HB), 2004 WL 2912903, at *4 n.2

(S.D.N.Y. Dec. 15, 2004) (Asian American, native of Bangladesh); David v. Apfel, Levy,

Zlotnick & Co., No. 91 Civ. 3384 (MGC), 1993 WL 245521, at *3 (S.D.N.Y. June 25,

1993) (Indian); Ze-Ze v. Kaiser Permanente Mid-Atlantic States Regions, Inc., 833 F.

Supp. 2d 543, 549 (E.D.Va. 2011) (native of Africa).  Further, each of the Plaintiffs was

terminated (or allowed to resign) after being required to sit for the EPE or an oral

language assessment examination and failing to obtain a passing score.  This clearly

constitutes an adverse employment action.  See Feingold v. New York, 366 F.3d 138, 152

(2d Cir. 2004) ("[e]xamples of materially adverse employment actions include

termination of employment") (internal quotations omitted).

　　　　Turning to the second element, a "plaintiff need not show perfect

performance or even average performance;" he "need only show that his performance was

of sufficient quality to merit continued employment."  Powell v. Syracuse Univ., 580 F.2d

1150, 1155 (2d Cir. 1978) (quoting Flowers v. Crouch-Walker Corp., 552 F.2d 1277,

1283 (7th Cir. 1977)).  Here, each Plaintiff worked either as a per diem or full-time court

interpreter for OCA for an extended period, and many of them were so employed for ten

years or more.  This alone meets their minimal burden of showing that they were

qualified for their respective positions.

　　　　The key question therefore relates to the fourth element of a prima facie

disparate treatment claim, which requires a showing that the Plaintiffs' terminations

occurred under circumstances giving rise to an inference of discrimination.  To establish

this element, the Plaintiffs need only demonstrate that OCA treated them less favorably

than similarly situated employees outside their protected group.  Graham, 230 F.3d at 39.

In that regard, the Plaintiffs allege that they were forced to take an examination, or series

of examinations, not required of interpreters other than those who were African, Indian,

or Bangladeshi.  OCA disputes the accuracy of their factual contention, which both sides

have addressed in considerable detail.  (See, e.g., OCA Mem. at 13-17; Opp. Mem. at 19-

24; ECF No. 65 ("Reply Mem.") at 4-9; ECF No. 52 (Dfts' Rule 56.1 Statement of

Undisputed Facts); ECF No. 56 (Pls' Rule 56.1 Counter Statement)).

   If, indeed, the Plaintiffs were able to show that only African, Indian, and

Bangladeshi interpreters were tested (or retested), they would meet their limited prima

facie burden of showing circumstances suggesting that they were the victims of

discriminatory treatment.  Given the minimal burden to which they are subject at this

stage of the analysis, I will assume that their allegations regarding discriminatory

treatment are sufficient to satisfy the fourth element of their prima facie case of

discrimination.

   b. Legitimate Nondiscriminatory Reason for Termination

   At the second step of the McDonnell Douglas analysis, the burden shifts to

OCA to proffer a legitimate nondiscriminatory explanation for terminating the Plaintiffs.

OCA contends that an "employee's failure to pass an examination assessing competency

to perform job duties is a legitimate and nondiscriminatory reason for terminating that

person's employment."  (OCA Mem. at 16).  Assuming that the testing protocol is not

designed to weed out minority interpreters, this rationale for discontinuing the Plaintiffs'

employment plainly meets the requirement that OCA set forth a nondiscriminatory

explanation for its actions. Accordingly, the Plaintiffs are no longer entitled to rely on a rebuttable presumption that they were victims of unlawful discrimination. Indeed, that presumption "drops from the case." Texas Dep't of Cmty. Affairs, 450 U.S. 248, 255 n.10 (1981); accord, St. Mary's, 509 U.S. at 510-11.

> c. Pretext

The burden thus shifts back to the Plaintiffs to demonstrate that (i) OCA's proffered rationale for its decision to require the Plaintiffs to take competency exams, and to terminate them after they failed, is pretextual, and (ii) the real reason for OCA's actions was discrimination. Slattery, 248 F.3d at 93-94. At the summary judgment stage, of course, the Plaintiffs need only establish a genuine issue of material fact in this regard. Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1225 (2d Cir. 1994). Here, for the reasons set forth below, the Plaintiffs have failed to make the requisite showing.

Although the Plaintiffs advanced various theories of discrimination during their depositions, their opposition to OCA's summary judgment motion focuses principally on one claim: that OCA improperly treated them differently than other interpreters by deciding to test their competence in both English and a foreign language after they had been working successfully as OCA court interpreters for many years. An assessment of the merits of this claim requires a somewhat detailed review of OCA's policies and procedures.

At the outset, the Plaintiffs suggest that they were fired because they failed one test while "hundreds of Spanish interpreters were allowed to fail one test and still

remain employed." (Opp. Mem. at 7) (emphasis in original). The basis for this claim appears to be a chart produced by OCA during discovery which summarizes the test results and hiring of Spanish court interpreters through competitive exams. (Suppl. Decl. of Gregory Antollino, dated Mar. 29, 2013 ("Antollino Suppl. Decl."), Ex. 1 (OCA Interrog. Resps.) at Ex. A; see id. at 9 (citing Ex. A to OCA Interrog. Resps.)). On that chart, the exams are listed in columns in reverse chronological order. The applicants, in turn, are listed in rows alphabetized by their last names. Information regarding each interpreter is set forth in the cells created by the intersection of the rows and columns. For example, certain applicants are identified with a "P," which indicates that they passed both the written and oral components of the Spanish exam and are "eligible for appointment." (Antollino Suppl. Decl. Ex. 1 at Ex. A) (emphasis added). Other applicants are identified by the letter "H," which indicates they were hired. There also is a separate column for the applicant's hire date.

From this information, the Plaintiffs suggest that each applicant identified with an "H" and not a "P" – unlike the Plaintiffs – must have been hired without having passed both the written and oral components of the exam. This, however, is sheer conjecture. Indeed, if anything, it seems clear that the use of the letter "P" was reserved for applicants who had not yet been hired from the competitive list but were merely "eligible" to be hired. Accordingly, the fact that an "H" instead of a "P" appears in the field for an applicant who has been hired from the competitive list scarcely means that the applicant was hired despite failing to pass both components of the competitive test, as the Plaintiffs appear to suggest. In fact, the logical inference is that someone who passed

both the written and oral components of the exam and later was hired would typically be identified by an "H," not a "P."[11]  (See Klein Suppl. Aff. ¶ 4(b)).

There are two other individuals (Carmen Llera and Joseph Rodriguez) who have not taken any Spanish competitive exam yet are employed by OCA as Spanish court interpreters.  Both of these individuals, however, are "part-time Spanish staff interpreters who are assigned to courts in Buffalo, New York."  (Id.).  OCA further represents that both of these individuals took and passed the Spanish per diem exam between 1996 and 1998.  (Id.).  Even if they did not, the fact that two Spanish interpreters working in a different city may have slipped through the cracks hardly suggests that the Plaintiffs were the victims of intentional discrimination.

The Plaintiffs also note, correctly, that a separate chart, which summarizes the testing history of interpreters of languages other than Spanish, indicates "Test info not available" with respect to the EPE results of numerous interpreters employed by OCA.  (See Antollino Decl. Ex. 9).  As previously noted, prior to 2000, UCS relied on an applicant's passing score on the oral examination as the basis for concluding that the applicant was competent in English because the EPE did not exist.  (Klein Suppl. Aff. ¶ 4(c)).  After 2000, if an oral exam was developed, the interpreters whose primary

---

[11]       There are certain exceptions.  For example, there are applicants who are shown to have passed an earlier exam, but to have been hired pursuant to a different exam.  (See, e.g., Viviana Bastone).  There also are twelve applicants who appear to have taken and passed the written and oral exams one or more times after having been hired from the competitive list generated as the result of an earlier exam.  (See, e.g., Ricardo Fernandez (who passed three separate written and oral exams after being hired)).  It is unclear why this is so, but it does not suggest that they were hired without having passed both components of the test at an earlier time.  Indeed, OCS confirms that all Spanish language interpreters passed both the written and oral components of the competitive examination before they were hired.  (Klein Aff. ¶ 7).

proficiency was in that language were required to take and pass the EPE in addition to the newly-developed oral exam.  Interpreters who had passed an oral exam prior to 2000, however, were not required to take the subsequently developed EPE.  (<u>See</u> Klein Dep. at 70-72; Klein Suppl. Aff. ¶ 4(c)).  Consequently, the chart reflects entries of "Test info not available" for these interpreters.  There were many languages to which this applied, including Haitian Creole, Greek, Mandarin Chinese, Cantonese, Russian, Arabic, Polish, Italian, and Korean.  (Klein Dep. at 69-72; Antollino Decl. Ex. 9).

    The Plaintiffs complain the "majority" of the interpreters who were required to take oral exams after 2008 were Bangladeshi, Pakistani, Indian, or African employees who were permanent staff.  This is scarcely surprising, however, since it was not until 2008 that UCS developed oral language assessment exams in Hindi, Punjabi, Urdu, and Wolof (as well as Bosnian, Croatian, Serbian, Hebrew, and Japanese).  (Klein Aff. ¶ 20; Klein Dep. at 17, 71).  As the OCS chart reflects, because the development of the EPE preceded the creation of these oral exams, it was not just the Plaintiffs, but also at least one speaker of Hebrew (Yoseph D. Ivry), who had to pass both the EPE and the oral proficiency exam in or around 2008 to remain employed.  (Antollino Decl. Ex. 9).  Moreover, there were other interpreters of languages that the Plaintiffs spoke who <u>passed</u> both of the required exams in or after 2008.  For example, El-Hadji Ly, who first was hired in 2001, passed the EPE in 2008 and the Wolof oral exam (on his second attempt) in 2009.  (<u>Id.</u>).  Similarly, Madhu Mishra, originally hired in 2001, passed the EPE in 2008 and the Bengali oral exam (on his second attempt) in 2009.  (<u>Id.</u>).  Sushma Sareen, hired

in 2003, passed the EPE in 2008 and the Punjabi oral exam in 2009.  (Id.).  Fanta Toure,

hired in 2003, passed the EPE in 2008 and the Wolof oral exam in 2009.  (Id.).[12]

       In sum, to accept the Plaintiffs' basic premise regarding the alleged

unfairness of the testing protocol, the Court would have to conclude that OCA was a

serial discriminator, singling out speakers of particular languages as oral exams were

developed in the years following the advent of the EPE.  However, as the OCA summary

chart shows, more than half of the interpreters who were retested pursuant to the PERB

settlement remain active OCA employees.  Those interpreters include speakers of

Bengali, French, Hebrew, Wolof, Croatian, and Punjabi.  (Antollino Suppl. Decl. Ex. 2).

In these circumstances, the mere fact that these six Plaintiffs failed to pass muster does

not suggest that OCA's testing policies were discriminatory.

       The Plaintiffs further complain that they were "[m]ultilanguage

interpreters" yet were tested in only one foreign language.  (Opp. Mem. at 10).  There has

been no showing, however, that any of them ever asked to be tested in another language.

In any event, pursuant to the Release Agreement, it was agreed that each of the Plaintiffs

would be afforded one additional opportunity to take the language proficiency exam in a

designated foreign language.  Having agreed to that litmus test, the Plaintiffs cannot

reasonably contend that it was discriminatory not to apply a different protocol that they

apparently never requested.

       The Plaintiffs also evidently object to the fact that three of them were

required to take the EPE even though "they were born and raised in countries where

---

[12]    At least two of these interpreters were beneficiaries of the PERB settlement.
(Compare Release Agreement with Antollino Suppl. Decl. Ex. 2).

English is a language officially or de facto." (Opp. Mem. at 11). It is unclear why the Plaintiffs consider this actionable (or evidence of discriminatory intent) since it is undisputed that <u>every</u> interpreter of a language for which an oral exam had been developed after 2000 was required to take the EPE. Accordingly, if this OCA policy discriminated against native English speakers, as the Plaintiffs apparently contend, it did so without regard to the interpreters' nationality.

Finally, the Plaintiffs raise several nonmeritorious complaints about the circumstances surrounding their oral exams. (<u>See</u> <u>generally</u> Opp. Mem. at 24). For example, in her complaint, Trivedi alleges that she "could not pass the oral test" because it was administered using a television with a "defective" audio system. (ECF No. 4 at 4). Seck makes a similar assertion. (<u>See</u> Seck Dep. at 64). The Plaintiffs have not shown through admissible evidence, however, that the test apparatus for interpreters of other languages was superior, much less that they were intentionally subjected to inferior testing conditions based on their national origin. Similarly, although both Ba and Seck object that their exams were initially scheduled during the month of Ramadan, (<u>see</u> Ba Dep. at 115-16; Seck Dep. at 41-42), there is no claim of religious discrimination in this case. Moreover, at least in Ba's case, OCA evidently was willing to reschedule the exams. (<u>See</u> Ba Dep. at 115-16). OCA's reasonable accommodation in that regard would preclude any claim of religious discrimination even if it were properly before the Court. <u>See</u> <u>Chukwueze v. NYCERS</u>, 891 F. Supp. 2d 443, 453 (S.D.N.Y. 2012) (citing <u>Cosme v. Henderson</u>, 287 F.3d 152, 158 (2d Cir. 2002)).

IV.     Conclusion

        For the foregoing reasons, OCA's consolidated motion for summary

judgment (ECF No. 48) should be granted in its entirety.

V.      Notice of Procedure for Filing of Objections to this Report and Recommendation

        The parties shall have fourteen days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Paul A. Crotty and to the chambers of the undersigned

at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to

any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any

requests for an extension of time for filing objections must be directed to Judge Crotty.

The failure to file these timely objections will result in a waiver of those objections for

purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas

v. Arn, 474 U.S. 140 (1985).

Dated:      New York, New York
            July 16, 2013

                                                    _____
                                                    FRANK MAAS
                                                    United States Magistrate Judge

Copies to:

All Counsel via ECF